Argued and submitted November 9, 2004, affirmed March 9, 2005

# STATE OF OREGON,
*Respondent,*

*v.*

# KENNETH MICHAEL PORTER,
*Appellant.*

## C022718CR; A120856

108 P3d 107

Laura Frikert argued the cause and filed the brief for appellant.

Robert M. Atkinson, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Wollheim and Schuman, Judges.

SCHUMAN, J.

## SCHUMAN, J.

Defendant appeals from a judgment of conviction on eight counts of identity theft and one count of unlawful use of a computer. At trial, the court disallowed his demurrer to the indictment under the identity theft statute, ORS 165.800, concluding that it did not violate the free speech guarantees in the Oregon and United States constitutions. The court also denied defendant's motion to suppress evidence discovered during a search of his apartment. We affirm.

A demurrer based on Article I, section 8, of the Oregon Constitution amounts to an assertion that the Legislative Assembly exceeded its authority when it enacted the statute in question; therefore, the facts of the case are not relevant. *State v. Spencer*, 289 Or 225, 228, 611 P2d 1147 (1980); *State v. Robertson*, 293 Or 402, 412, 649 P2d 569 (1982). The constitutional provision, after all, states a limitation on legislative power: "*No law shall be passed* restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right." (Emphasis added.) Nonetheless, the following facts, found by the trial court, supported by evidence, and not contested on appeal, are relevant to our consideration of defendant's assignment of error regarding suppression of evidence.

On April 17, 2002, at 11:08 p.m., Officer Neliton of the Beaverton Police Department, alerted by reports of heavy foot traffic at defendant's apartment, went to investigate. From a publicly accessible parking lot outside of the building, the officer heard loud music and, through a window, saw a woman on the second floor of defendant's apartment holding a short glass pipe. He saw her inspect a substance inside the pipe, hold a butane torch or strong lighter to it, and inhale three times. Neliton called Officer Todd, who is specially trained in narcotics enforcement, for backup. Todd, too, observed the woman through the window, and, based on the pipe, the butane torch, and the smoking process, believed she was smoking either methamphetamine or crack cocaine.

The officers knocked on the door of the apartment. When defendant answered, they told him there had been a

noise complaint and asked to see the person who "owned" the apartment. A woman appeared, and Neliton told her that they had seen somebody smoking methamphetamine upstairs and that they needed that person to come down and speak with them. The woman called for everybody to come downstairs. The woman whom the officers had seen smoking did so.

At that point, the officers heard distinctly human-generated noises coming from upstairs. When the officers asked the woman if anybody remained on the second floor, she became agitated and replied that only her dog was there. The officers did not believe her and called for more backup. When other officers arrived, Neliton and Todd went upstairs because, they testified, they were concerned for their safety and suspected that evidence was being destroyed. The door to one of the upstairs bedrooms was locked. Todd asked the occupant to come out, and defendant emerged. Inside the room, the officers saw canisters of paint or paint thinner, a butane torch, a wall of computer accessories, and a stack of what appeared to be templates for Oregon identification cards or driver's licenses. They smelled a "stench of not-so-long-ago smoked controlled substances." At that point, they ordered the occupants to remain where they were and Todd left to apply for a search warrant. He returned with one and seized, among other things, the evidence that defendant sought to suppress.

 We begin with defendant's constitutional challenge to ORS 165.800. That statute provides, in part:

"(1) A person commits the crime of identity theft if the person, with the intent to deceive or to defraud, obtains, possesses, transfers, creates, utters or converts to the person's own use the personal identification of another person.

"* * * * *

"(4) 'Another person' means a real or imaginary person."

To determine whether the statute violates Article I, section 8,[1] we must first determine whether it is written in terms

---

[1] On appeal, defendant makes no argument under the First Amendment.

directed to the substance of what a person might speak, write, or print, in which case the statute is unconstitutional unless "the restraint is wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859 demonstrably were not intended to reach"; or whether, on the other hand, the statute focuses on preventing or regulating harm. *Robertson,* 293 Or at 412; *see also State v. Plowman,* 314 Or 157, 164, 838 P2d 558 (1992). Some statutes focusing on harm specify expression as one way the harm might be caused; "[s]uch laws are analyzed for overbreadth," *Plowman,* 314 Or at 164, and will be sustained unless they implicate clearly privileged expression and are not susceptible to a narrowing construction. Other harm-focused statutes do not contain an element involving expression but can, in some situations, be enforced in such a way as to implicate it, for example a trespass statute enforced against a person engaging in a protest on public property. *City of Eugene v. Lincoln,* 183 Or App 36, 50 P3d 1253 (2002). Such statutes are evaluated on a case-by-case basis. *Id.*

■ ORS 165.800 creates a crime that targets deception or fraud. Only the deception aspect raises concerns under Article I, section 8; fraud is one of the conventional speech crimes that can be regulated even if the law focuses on the speech itself. *Robertson,* 293 Or at 412. Further, most of the regulated activity does not implicate speech at all: a person falls within the statute's scope only if he or she "obtains, possesses, transfers, creates, utters or converts" the identity of another. Of those acts, only two involve expression. "Creating" a document is clearly either printing or writing (or the electronic equivalent), and "to utter" is expressive whether the word has its technical legal meaning, "[t]o put or send (a document) into circulation," or its plain meaning, "[t]o say, express, or publish." *Black's Law Dictionary* 1582 (8th ed 2004). We therefore analyze ORS 165.800 only to the extent that it purports to criminalize creating or uttering the identification of another with the intent to deceive. The first step in that analysis is to determine whether the law, thus parsed, focuses on speech *per se* or on deception caused by speech.

■ A statute that imposes a penalty on, or otherwise regulates, speaking, writing, or printing some specified

expression even when that expression causes no harm, attempts no harm, or imminently threatens no harm, regulates speech *per se. State v. Spencer*, 289 Or at 229; *State v. Garcias*, 296 Or 688, 697, 679 P2d 1354 (1984). At first blush, the identity theft statute appears to be of that type because it "makes the speaking of the words themselves criminal, if spoken with the requisite intent, even if no harm [is] caused or threatened." *Spencer*, 289 Or at 229. Closer scrutiny, however, yields a different conclusion. The harm that the statute targets is deception. A person who either creates or utters the identification of another and who *intends* that act to deceive has taken a substantial step toward accomplishing the deception; the person, in other words, has *attempted* to achieve the harm. *See* ORS 161.405(1) (defining "attempt" to commit a crime as "intentionally engag[ing] in conduct which constitutes a substantial step toward commission of the crime"); *Garcias*, 296 Or at 697 (statute targeting attempted harm can be considered statute targeting harm). In other words, the identity theft statute is different from the disorderly conduct statute in *Spencer*, which made it a crime to " 'use[ ] abusive or obscene language, or make[ ] an obscene gesture, in a public place' " with the " 'intent to cause public inconvenience, annoyance or alarm.' " 289 Or at 227 (quoting ORS 166.025 (1979)). One can obviously use abusive or obscene language in a public place, intending to cause public inconvenience, annoyance or alarm, without taking a substantial step toward accomplishing that end—for example if the language is only mildly abusive and the public place is populated with jaded twenty-first century adults. It therefore cannot be said that using abusive or obscene language intending to cause the proscribed harm is *per se* an attempt to cause that harm. On the other hand, a person who, intending to deceive, has created false identification or who has "uttered" it *can* be said to have taken a substantial step toward achieving the objective. Much more than the would-be alarmer, inconveniencer, or annoyer in *Spencer*, the creator or utterer of false identification has, by that act alone, expended considerable energy in pursuit of the forbidden objective and has created a situation in which its accomplishment is within his or her power to achieve.

We therefore conclude that the identity theft statute does not focus on speech *per se*; rather, it focuses on the

attempt to cause a forbidden harm, that is, deceit. *See Robertson*, 293 Or at 433 (statute not directed to speech *per se* because "the focus is on the actual or probable commission" of the harmful activity).

■　That being the case, the statute is not unconstitutional unless it is substantially overbroad, that is, it purports to regulate or punish a substantial amount of protected speech.[2] Defendant suggests that it does. He offers two examples. A person who has been too often approached by strangers in bars seeking his or her name and number, in an attempt to avoid having to repel them, creates and "utters" a business card with a pseudonym and a nonexistent phone number. Or a person who, having taken a politically unpopular stance, finds himself or herself blacklisted, markets his or her writing under the name of a cooperative associate.

■　A statute that is attacked as overbroad may be saved by a narrowing construction that, in the majority of situations, prevents its application to protected speech. *Robertson*, 293 Or at 418; *State v. Moyle*, 299 Or 691, 701-02, 709 P2d 740 (1985). Here, such a construction is available. Unlike fraud, deceit has no well-settled common-law pedigree. Nonetheless, we believe that, as used by the legislature in the context of identity theft, the term denotes an attempt to obtain some benefit to which the deceiver is not lawfully entitled. Thus narrowed, the statute does not reach a significant amount of privileged expression.

■■　We turn to defendant's assignment of error relating to the suppression of evidence. According to defendant, the evidence was seized pursuant to a warrant, but the warrant

[2] The state argues that a statute cannot be unconstitutionally overbroad on its face, and therefore susceptible to a demurrer, unless it "is incapable of constitutional application. For more than a hundred years, the Supreme Court has stressed that statutes that may validly be applied in some circumstances may not be stricken in their entirety." That may be true with respect to challenges to some provisions of the constitution, but it is not the law with respect to Article I, section 8. *See, e.g., Robertson*, 293 Or 402 (successful facial challenge to coercion statute that could constitutionally be applied in many circumstances). A contrary rule would permit the legislature to enact a statute that was unconstitutional in all but a few improbable hypothetical situations. Under the state's theory, the statute would remain valid and lawfully on the books, chilling the perfectly lawful expression of those who did not want to risk an expensive, albeit predictably successful, legal defense.

itself was based on information that the officers obtained during an unlawful "sweep" of defendant's apartment. Regarding the sweep, defendant acknowledges that the officers received consent to enter the apartment but contends that they exceeded the scope of that consent when they went upstairs and looked into the room containing the evidence upon which they based the warrant application. Although we agree that a warrant based on unlawfully obtained information cannot justify a search, that is not what happened here. Law enforcement officials may conduct a search that is otherwise not justified if there are exigent circumstances. *State v. Snow*, 337 Or 219, 223, 94 P3d 872 (2004). One form of exigency is the potential destruction of evidence. *Id.* Here, officers had observed drug use and drug paraphernalia through the window and, after being told that all the occupants of the house were downstairs and in their presence, they heard a person upstairs who, they reasonably believed, could be destroying evidence. They were therefore justified in conducting a "sweep" of the upstairs and in using information obtained thereby in their application for a warrant.

Affirmed.